UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

CYPRESS PHARMACEUTICALS, INC.
AND HAWTHORNE PHARMACEUTICALS, INC.
PLAINTIFFS


VS.                              CIVIL ACTION NO. 3:10CV691TSL-MTP


CRS MANAGEMENT, INC., PRACS INSTITUTE,                    DEFENDANTS
LTD., GATEWAY RESEARCH, INC., AND
BA RESEARCH INTERNATIONAL, L.P.


MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendants
CRS Management, Inc. (CRS), PRACS Institute, Ltd. (PRACS), Gateway
Medical Research, Inc. (Gateway) and BA Research International
L.P. (BA Research) to dismiss for lack of personal jurisdiction
and for failure to state a claim upon which relief may be granted
pursuant to Rule 12(b)(2) and (6), respectively.  Plaintiffs
Cypress Pharmaceuticals, Inc. (Cypress) and Hawthorne
Pharmaceuticals, Inc. (Hawthorne) have responded to the motion,
and the court, having considered the memoranda of authorities,
together with attachments, submitted by the parties, concludes the
motion to dismiss on jurisdiction grounds should be denied as to
CRS but granted as to PRACS, Gateway and BA Research; that the
Rule 12(b)(6) motion should be denied; and that the motion to
dismiss any claims by Hawthorne should be granted.

Plaintiff Cypress, a Mississippi corporation with its
principal place of business in Madison, Mississippi, is a
specialty pharmaceutical company engaged in the business of

developing, marketing and distributing prescription drugs, a major
focus of which is respiratory therapeutics.  On April 30, 2008,
Cypress, acting on behalf of Hawthorne, its wholly owned
subsidiary, contracted with defendant CRS to conduct
bioequivalence testing for two prescription drugs that Cypress had
developed to treat cough and cold symptoms,[1] one containing two
active ingredients, "A" and "B", and the other containing three
active ingredients, "A", "B" and "C".

The agreement provided that Cetero, using the services of one
or more of its affiliates (PRACS, Gateway and/or BA Research),
would conduct the bioequivalence study according to the protocol
set out in the agreement and would perform the services with "due
care, generally prevailing industry standards and in compliance
with (i) the Protocol and (ii) all Applicable Laws and with
accepted standards of Good Clinical Practice and Good Laboratory
Practice, as may be applicable to the subject Study and/or as
defined in the Protocol."  The agreement required Cypress to
provide all drugs and test articles to be studied unless the

---

[1]  According to the complaint, "to gain approval for its
prescription drug products, the Food and Drug Admnistration (FDA)
required Cypress to conduct a bioequivalence clinical study
comparing Cypress' proposed products to existing approved
products.  According to the FDA, "[b]ioequivalence means the
absence of a significant difference in the rate and extent to
which the active ingredient or active moiety in pharmaceutical
equivalents or pharmaceutical alternatives becomes available at
the site of drug action when administered at the same molar dose
under similar conditions in an appropriately designed study." 21
C.F.R. § 320.1(e) (1995) (emphasis omitted).

agreement provided otherwise.  Notably, the agreement recites that
the "Agreement shall be construed according to and governed by the
laws of the State of New Jersey, without regard to principles of
conflicts of law."

As provided for in the agreement, Cypress sent test products
for the study from its facility in Madison to Cetero in Missouri.
From May to July 2008, Gateway administered the test products to
study participants, from whom pre and post-does blood samples were
drawn.  The samples were then analyzed by BA Research at its
facility in Texas.  BA Research issued a report of its sample
analysis, which was then incorporated into the full Clinical Study
Report which was prepared by PRACS.

On September 3, 2008, Cetero mailed the first version of the
report to Cypress in Madison and later on October 10, 2008, it
provided an updated report.  The study conducted by Cetero
revealed that two of the active ingredients, "B" and "C", were
within the FDA's guideline ranges for demonstrating
bioequivalence, while ingredient "A" was satisfactory with respect
to two parameters and just outside the range with respect to a
third parameter.  On November 7, 2008, in reliance on the Clinical
Study Report, Cypress submitted two New Drug Applications (NDA) to
the FDA.  The first, for the "ABC" product, was designated NDA No.
022439 and the second, for the "AB" product, was designated NDA
No. 022442.

In mid-January 2009, the FDA notified Cypress that while
both NDA No. 0022439 and NDA No. 022442 were sufficiently complete

3

to permit substantive review, it had identified "potential review issues" with both applications, stating, "A preliminary assessment of the data indicates that [Ingredient A] for your product is out of the 8-125% goal post of BE [bioequivalence]."  On the basis of the FDA's notice, Cypress engaged another research company to conduct a second study to evaluate and establish the bioequivalence of Ingredient "A".  Based on Cetero's test results, Cypress believed that Ingredients "B" and "C" would withstand FDA review and thus, did not seek to re-perform the bioequivalence trials for these ingredients.

On September 18, 2009, before the second research company had completed its bioequivalence study, the FDA informed Cypress that neither of its applications would be approved because Ingredient "A" fell outside the approved guideline range of bioequivalence. The FDA did not identify any deficiencies with regard to Ingredients "B" and "C".  In December 2009, Cypress submitted an amended NDA which included the results from the second trial of Ingredient "A" showing that the ingredient met the FDA's bioequivalence guidelines.

On May 3, 2010, while Cypress' applications remained pending, and unbeknownst to Cypress, the FDA began an inspection of Cetero's Houston bioanalytical testing facility.  The next day, by email, Dr. Chinna Pamidai, President of BA Research, advised Cypress of the inspection but did not disclose any issues which might have risen or which could have been expected to arise.  The inspection closed on May 7, 2010 with the inspector issuing a Form

4

483, which under FDA regulations must be issued to top-level management when an inspector finds minor and major issues in during an inspection.

Over the next few days, Cypress made repeated requests for information regarding the inspection.  On May 11, 2010, Cetero did advise Cypress that a Form 483 had been issued, but refused to provide either Cypress a copy of the form or any details about the inspection.  During the next few weeks, Cetero continued to refuse to provide a copy of the Form 483, intimating that it would do so when it provided the FDA a response.  On June 4, 2010, Cypress filed a Freedom of Information Act request with the FDA, seeking to obtain the May 7th Form 483.  Finally, on October 27, 2010, Cypress received a redacted copy of the Form 483 from the FDA.

From the Form 483, Cypress learned that the FDA's investigation had been prompted by receipt from Cetero of a June 2009 report detailing an internal investigation by Cetero. According to the Form 483, the FDA concluded that "[r]ecords for the extraction of subject samples in numerous studies were falsified . . . in at least 1900 instances over the period April 15, 2005 to June 30, 1990.  The falsification involve[d] data from multiple studies from multiple sponsors."  According to the complaint, on information and belief, data in Cypress' Clinical Study Report was found to be falsified.

On June 11, 2010, the FDA rejected Cypress' NDAs.  The FDA concluded that the "[Clinical Study Report] and the study conducted by the third-oarty CRO, designed to establish the

5

bioequivalence of the active ingredients 'A,''B,' and 'C' in Cypress's drug products to the reference products contained deficiencies both in the conduct of the study and the methods used at the analytical sites."

Plaintiffs Cypress and Hawthorne filed this suit, premised on diversity jurisdiction, on November 29, 2010, asserting claims against all the defendants for fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation and breach of fiduciary duty.  At the heart of all these claims are the allegations that upon defendants' discovery of improprieties at the Texas testing facility, defendants failed in their duty to disclose to Cypress that the clinical study had not been conducted properly, in compliance with good clinical practices and good laboratory practices.  Plaintiffs also charge that defendants CRS, PRACS and BA Research breached both their duty to exercise due care in training and supervising their employees and to use due care to ensure that bioanalytical testing was conducted with good laboratory practice and other applicable standards of care. Finally, plaintiffs allege claims against CRS for breach of contract and tortious breach of contract.

In their motion, defendants, all of which are foreign companies/corporations, contend that plaintiffs' complaint against them must be dismissed since they are not subject to personal jurisdiction in Mississippi; that in any event, plaintiffs' tort claims and attendant punitive damages claim must be dismissed pursuant to New Jersey's economic loss doctrine; and that the

putative claims of plaintiff Hawthorne must be dismissed for failure to state a claim upon which relief can be granted. Plaintiffs respond that they have alleged a sufficient factual basis for the exercise of personal jurisdiction as to each of the defendants; that the parties' selection of New Jersey law to govern their agreement is invalid, and that alternatively, either New Jersey does not apply to their tort claims or does not dictate dismissal of these claims; and that Hawthorne has alleged viable claims against defendants consistent with Rule 8 and its claims therefore are not subject to dismissal.

In the court's opinion, as an initial matter, that part of defendants' motion seeking dismissal of Hawthorne as a plaintiff for failure to state a claim for relief is well taken. The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief. See Wright & Miller, Federal Practice and Procedure: Civil 3d § 1356 (2004). With the limited exception of those cases described in Rule 9, a complaint need only satisfy the "simplified pleading standard" of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). However, as the Supreme Court has recently made clear, while Rule 8 is not exacting, it does "require[] a 'showing,' rather than a blanket assertion, of entitlement to relief," Bell Atl. Corp. v. Twombly, 550 U.S. 544,

556 n.3, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), so that to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain enough factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) (quoting Twombly, 550 U.S. at 561-62, 127 S. Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 559, 127 S. Ct. 1955.

Here, regarding Hawthorne, the complaint alleges only that it is the wholly owned subsidiary of Cypress and that it is organized under the laws of Mississippi. In response to the motion, plaintiffs maintain that the complaint is adequate because the use of the word "Cypress" in the complaint necessarily included Hawthorne, which is Cypress' subsidiary, and because Hawthorne markets Cypress' "branded" pharmaceutical products, it was foreseeable that Hawthorne would be injured or damaged by defendants' tortious conduct. These allegations would likely be sufficient if they appeared in the complaint; but they are not in the complaint and it is bereft of factual allegations from which the court could conclude that Hawthorne has either contract or tort claims against the defendants. Accordingly, as plaintiffs have not sought leave to amend their complaint to include

8

pertinent factual allegations which would support either tort or contract claims on behalf of Hawthorne, defendants' motion to dismiss Hawthorne's claims will be granted.

Turning to their challenge to personal jurisdiction, defendants point out that they are all nonresidents of Mississippi:  CRS/Cetero is a Delaware corporation with its principal place of business in North Carolina; Gateway is a Missouri corporation with its principal place of business in Missouri; BA Research is a Texas corporation with its principal place of business in Texas; and PRACS is a North Dakota corporation with its principal place of business in North Dakota. Defendants further point out, and it is undisputed, that no defendant is or has ever registered to do business in Mississippi; has or ever had an office in Mississippi, employees in Mississippi, a telephone listing in Mississippi, bank accounts in Mississippi or has owned or leased real or personal property in the state; or has any clients in Mississippi other than Cypress.

It is well established that this court, exercising diversity subject jurisdiction, may exercise personal jurisdiction over a nonresident only to the extent allowed by a state court under applicable state law.  Allred v. Moore & Peterson, 117 F.3d 278, 281 (5th Cir. 1997), cert. denied, 522 U.S. 1048, 118 S. Ct. 691, 139 L. Ed. 2d 637 (1998).  "A state court or a federal court sitting in diversity may assert jurisdiction if: (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the fourteenth amendment

to the United States Constitution." Id. (quoting Cycles, Ltd. v.
W.J. Digby, Inc., 889 F.2d 612, 616 (5th Cir. 1989)).  It is the
plaintiff's burden to establish jurisdiction.  Guidry v. U.S.
Tobacco Co., 188 F.3d 619, 625 (5th Cir. 1999).

> Mississippi's long-arm statute provides:
>
> Any nonresident person, firm, general or limited
> partnership, or any foreign or other corporation not
> qualified under the Constitution and laws of this state
> as to doing business herein, who shall make a contract
> with a resident of this state to be performed in whole
> or in part by any party in this state, or who shall
> commit a tort in whole or in part in this state against
> a resident or nonresident of this state, or who shall do
> any business or perform any character of work or service
> in this state, shall by such act or acts be deemed to be
> doing business in Mississippi and shall thereby be
> subjected to the jurisdiction of the courts of this
> state.

Miss. Code Ann. § 13-3-57.

Further, the due process clause "requires satisfaction of a
two-prong test in order for a federal court to properly exercise
jurisdiction: (1) the nonresident must have minimum contacts with
the forum state, and (2) subjecting the nonresident to
jurisdiction must be consistent with 'traditional notions of fair
play and substantial justice.'" Freudensprung v. Offshore
Technical Servs., Inc., 379 F.3d 327, 343 (5th Cir. 2004) (citing
Asarco, Inc. v. Glenara, Ltd., 912 F.2d 784 (5th Cir. 1990), and
International Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154,
90 L. Ed. 95 (1945)).

Where, as here, the court rules on a motion to dismiss for
lack of personal jurisdiction without an evidentiary hearing, the
plaintiff is only required to make a prima facie case that

jurisdiction is proper.  Paz v. Brush Engineered Materials, Inc., 445 F.3d 809, 812 (5th Cir. 2006).  To determine whether a prima facie case for jurisdiction has been made, "uncontroverted allegations in the plaintiff's complaint must be taken as true," Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990) (citations omitted).  This being said, the court is not limited to consideration of only the assertions in the plaintiff's complaint; rather, it may also "consider the contents of the record at the time of the motion, including affidavits ...,' " Paz, 445 F.3d at 812 (quoting Quick Technologies, Inc. v. Sage Group, PLC, 313 F.3d 338, 343 (5th Cir. 2002).  In reaching its decision, "'conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists.'" Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990).

Cypress contends it has made a prima facie showing that the court has jurisdiction over CRS under the contract prong of the long-arm statute and over all the defendants under the tort and doing business prongs of the long-arm statute.  It further maintains that the court's exercise of jurisdiction comports with due process and that defendants cannot demonstrate that the assertion of jurisdiction by this court would be unfair.

As Cypress points out, it did perform part of the contract in Mississippi, i.e., it mailed the test supplies from its Madison, Mississippi facility to Gateway, in Missouri.  Plaintiff thus concludes that CRS is subject to jurisdiction in this court under

the contract prong of the long-arm statute.  Defendants, however, argue that jurisdiction is proper under the contract prong of the long-arm statute only if the parties' contract actually requires that performance, or some part thereof, is to occur in the forum; and since nothing in the subject contract *required* that Cypress send the study supplies from its Mississippi headquarters, then the contract prong provides no basis for jurisdiction.

In the court's opinion, contrary to defendants' suggestion, the potential for jurisdiction based on the contract prong is not foreclosed solely because the agreement does not expressly dictate that a party's performance of some part of the agreement is to occur in the forum state.  Rather, the fact that the agreement is silent as to the place of performance simply means that the court must ascertain where performance may be considered to have been contemplated for long-arm purposes.  For example, because the bailment contract at issue in Cycles v. Digby was silent as to the place of performance and no fair inference could be made regarding the place to which the bailee was to return bailed property, the court turned to the general rule of bailment law that a bailee has the implied duty to return the bailment to the bailor at the place the property was received, 889 F.2d 612, 617 (5th Cir. 1989); and since the property was received in Tennessee, and no other performance was contemplated by any party in Mississippi, the court held that the contract prong of the long-arm statute was not satisfied.  Id. at 617-618.

In the court's opinion, in the case at bar, notwithstanding that the agreement does not require performance by Cypress in Mississippi, the conclusion that Cypress was to perform at least some part of the contract in Mississippi may fairly be inferred from the substance of the contract.  The objective of the parties' agreement was bioequivalence testing of certain pharmaceutical products developed by Cypress at its Madison, Mississippi facility.  Pursuant to Section 4.1 of the parties' agreement, Cypress was obligated to "provide ... all drugs or test articles to be studied under this Agreement and/or the Protocol[.]"  While the agreement did not explicitly state that Cypress was to send such drugs and test articles from its facility in Mississippi, it is clear this is what was intended and contemplated by the agreement.  The court thus readily concludes that CRS is subject to jurisdiction under the contract prong of the long-arm statute.[2]

---

[2]    The court notes that the parties' contract includes a choice-of-law provision, selecting New Jersey law to govern the agreement.  The court is aware of no New Jersey authority specifying the place of performance where the contract is silent. The general rule appears to be as follows:

> If the contract is silent as to the place of performance, such place is to be determined in accordance with the supposed understanding of the parties at the time of the contract, and, hence, will vary according to the nature and subject matter of the contract.  Such mutual intention or understanding should be ascertained in accordance with the general rules of construction, taking into consideration all the facts and circumstances of the case.

17A C.J.S. Contracts § 478.  Cf. id. (observing that "[i]n general with respect to contracts for the delivery of specific articles, the usual residence or place of business of the obligor is the place of performance, where no place is expressed.")

The court is also satisfied that it would not offend due process for this court to exercise jurisdiction over CRS.  The court is persuaded that Robert Lewis' affidavit establishes the existence of minimum contacts purposefully directed at the forum in the formation of the contract.  See Barbour Intern., Inc. v. Permasteel, Inc., 507 F. Supp. 2d 602, 608 (S.D. Miss. 2007) (in determining whether due process is satisfied, the court "'look[s] to the factors of prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing to determine whether [Permasteel] purposefully established minimum contacts with the forum'") (quoting Stuart v. Spademan, 772 F.2d 1185, 1193 (5th Cir. 1985)).

"Under the tort prong of the Mississippi long-arm statute, personal jurisdiction is proper if any element of the tort (or any part of any element) takes place in Mississippi." Paz, 445 F.3d at 812.  Here, Cypress maintains that the element of detrimental reliance, key to the claims for fraudulent concealment and fraudulent and negligent misrepresentation, necessarily took place at its principal place of business in Madison, Mississippi. Likewise, Cypress maintains that with regard to its claim for breach of fiduciary duty, it necessarily reposed its trust in defendants at its principal place of business in Madison, Mississippi.

In response, defendants do not dispute that plaintiff detrimentally relied in the State of Mississippi.  However, they assert that "a plaintiff's detrimental reliance can give rise to

14

jurisdiction over the defendant in Mississippi if – and only if–
the reliance is directly related to the defendant's intentional
and knowing contact with Mississippi."  From this, they reason
that since plaintiff has made clear that its tort claims are not
premised on defendants' 2008 delivery of the Clinical Study Report
to plaintiff in Mississippi but are instead based on defendants'
later failure to disclose material information regarding the
integrity of the testing, then plaintiff's detrimental reliance is
unrelated to defendants' affirmative contact with the forum and
hence is insufficient to confer jurisdiction under the tort prong
of the long-arm statute.

　　　It seems to the court that defendants' argument in this
regard is not based on the requirements of the long-arm statute,
but rather is a due process challenge to jurisdiction.[3]  Due

---

　　　[3]　　In fact, <u>Bufkin v. Thermage</u>, NO. 3:08CV465TSL–JSC,
2009WL114780 (S.D. Miss. January 16, 2009), ostensibly cited by
defendants for its long-arm statute analysis, actually was
resolved on the basis of due process requirements.  The plaintiff
in <u>Bufkin</u> traveled to Alabama for cosmetic surgery.  <u>Id.</u> at *3.
During the procedure, allegedly as a result of the doctor's
negligence, she suffered a severe burn, which the doctor did not
disclose and in fact concealed from her by covering the wound with
bandaging. <u>Id.</u>  In response to the doctor's motion to dismiss for
lack of personal jurisdiction, the plaintiff argued that a tort
was committed in Mississippi because as a result of the doctor's
failure to disclose the injury, her condition deteriorated after
her return home to Mississippi.  <u>Id.</u>
　　　An issue was presented as to whether the injury occurred in
Mississippi, in which case part of the alleged tort occurred here,
or whether merely the consequences of an injury that occurred
elsewhere were felt in Mississippi, so that the tort prong was not
satisfied.  <u>Id.</u> at * 6.  The court expressly made no determination
with respect to whether any injury occurred in Mississippi for
purposes of the long-arm statute, and instead, based its decision
on the absence of any connection between the doctor and
Mississippi.  <u>Id.</u> at *7.  Specifically, because the doctor's

process requires that the defendant have minimum contacts with the

forum state.

> The "minimum contacts" prong is further subdivided into
> contacts that give rise to specific jurisdiction and
> those that give rise to general jurisdiction.  The
> former arises when "(1) the defendant purposely directed
> its activities toward the forum state or purposely
> availed itself of the privileges of conducting
> activities there; and (2) the controversy arises out of
> or is related to the defendant's contacts with the forum
> state."  Id. (citing Helicopteros Nacionales de
> Colombia, S.A. v. Hall, 466 U.S. 408, 104 S. Ct. 1868,
> 80 L. Ed. 2d 404 (1984)).  "When a cause of action does
> not arise out of a foreign defendant's purposeful
> contacts with the forum, however, a court may exercise
> general jurisdiction when the defendant has engaged in
> 'continuous and systematic contacts' in the forum."  Id.

Barbour Intern., Inc. v. Permasteel, Inc., 507 F. Supp. 2d 602,

606 (S.D. Miss. 2007).  Plaintiff does not contend that any

defendant has had "continuous and systematic" contacts with

Mississippi, and instead, it implicitly urges that an exercise of

specific jurisdiction is warranted.

Here, plaintiff has alleged that an element of its tort

claims occurred in Mississippi, in that it detrimentally relied in

Mississippi on defendants' nondisclosure.  Regarding due process

considerations, plaintiff, citing Wien Air Alaska, Inc. v. Brandt,

195 F.3d 208 (1999), submits that because the complaint alleges

misrepresentations and omissions by defendants which were directed

toward Cypress in Mississippi and which it claims give rise to its

---

failures were alleged to have occurred during the plaintiff's
doctor's visits in Alabama, the court concluded that the
defendants' failure to treat or inform plaintiff of the fact and
severity of her burns did not involve any contact by the
defendants with Mississippi.  Id.

tort claims, then it has established a prima facie case of jurisdiction.

In Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208 (1999), the plaintiff, a Texas corporation, hired Brandt, a German lawyer, to aid Wien Air in its expansion into Eastern Europe, including its acquisition of a certain German airline company.  Id. at 210-211. During his representation of Wien Air, Brandt, who remained at all times in Germany, had frequent communications with Wien Air, but in those communications, he never disclosed to Wien Air that he had financial interests adverse to Wien Air's in its efforts to purchase the German airline, nor did he disclose that he had undertaken representation of the seller of the German airline, whose interests were obviously adverse to those of Wien Air.  Id. at 211.

After a deal to purchase the German airline was not consummated and Wien Air learned that Brandt was also providing legal representation to the seller, Wien Air sued Brandt in Texas. Brant moved to dismiss for lack of jurisdiction.  Wien Air opposed the motion, and presented evidence that it had detrimentally relied on Brandt's misrepresentations and omissions by authorizing Brandt to take more of its money with the hope that the much anticipated acquisition of the German airline would finally close. Id. at 214.

In holding that Brandt was subject to jurisdiction in Texas, the Fifth Circuit emphasized that for an exercise of specific jurisdiction, the defendant's contacts/communications with the

17

forum must give rise to the cause of action.  Id. at 213.  Citing

Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804

(1984), the court stated that where a defendant is charged with

intentional, tortious conduct directed toward the forum, the

defendant "must reasonably anticipate being haled into court

there."  Wien Air, 195 F.3d at 212.  The court continued, "'The

foreseeable effects of a tort 'are to be assessed as *part* of the

analysis of the defendant's relevant contacts with the forum.'"

Foreseeable injury alone is not sufficient to confer specific

jurisdiction, absent the direction of specific acts toward the

forum."  Id. (internal quotations and citations omitted).  While

the court agreed with Brandt that a defendant's communications

directed at the forum, standing alone, were insufficient to

support a finding of minimum contacts, it found that "[w]hen the

actual content of communications with a forum give rise to

intentional tort causes of action, this alone constitutes

purposeful availment."  Id. at 213.  Along these lines, the court

noted that as a general proposition, the fact that a foreign

lawyer may have chosen to represent a client in the forum

jurisdiction would not in itself confer jurisdiction over the

lawyer in the forum if the claim does not arise from the lawyer's

contacts with the forum.  "However, when the claim arises from a

breach of fiduciary duty based on the failure to disclose material

information, the fact that the lawyer continually communicated

with the forum while steadfastly failing to disclose material

information shows the purposeful direction of material omissions

to the forum state." Id. at 214.  In short, the court in Brandt found sufficient contacts for specific jurisdiction under a due process analysis because Brandt's communications with the plaintiff in Texas in which he allegedly failed to disclose material information related to the transaction that was at the center of the lawsuit and gave rise to the plaintiff's claims.

That cannot be said of the present case.  Here, defendants had contact with the forum when they mailed the Clinical Study Report to plaintiff in Mississippi.  However, as defendants point out, plaintiff does not assert that defendants knew or had reason to know at the time the Clinical Study Report was sent to plaintiff in October 2008 of improprieties that were occurring at the Texas Cetero facility.  That is, plaintiff is not alleging that defendants breached any fiduciary duty or negligently or intentionally failed to disclose material facts *on the date the report was delivered*.  Rather, the crux of plaintiff's claims is that when defendants subsequently became aware in June 2009 of the problems with the testing at the facility, a duty then arose to communicate this information to plaintiff and that by their silence, defendants concealed information which they were duty-bound to share and thereby committed various torts as alleged in the complaint.  Since plaintiff's claims are not based on defendants' providing the report to them initially, then defendants' contact with the forum in sending plaintiff the report in Mississippi is not a relevant contact for this specific jurisdiction analysis.

19

The complaint does allege there were communications by defendants directed towards Mississippi *after June 2009*, when defendants were aware of the problems at the facility, and that in these communications, defendants "did not disclose any deficiencies or issues that [they] knew or should have known might affect the integrity, quality, or reliability of [Clinical Study Report]." However, it is clear from the evidence presented that these communications were not in any way related to the earlier Clinical Study Report, and instead they consisted of requests for payment and solicitations for new business.[4] None of these communications by defendants touched on the Clinical Study Report, and thus do not give rise to plaintiff's claims herein. For the reasons given, plaintiff has not shown jurisdiction is proper as to defendants PRACS, Gateway and BA Research.[5]

In addition to the motion to dismiss on jurisdiction grounds, defendants have moved under Rule 12(b)(6) to dismiss plaintiff's

---

[4]   The affidavit of Robert Lewis submitted in response to the motion recites that he received email communications from the Cetero defendants in July, September and December 2009. In a September email, PRACs sought payment for another series of testing which plaintiff had engaged defendants to perform. In July and September 2009 emails, a Cetero representative wrote Lewis seeking to discuss the possibility of using Cetero to conduct additional studies. Finally, in a December 2009 email, Cetero inquired about conducting an additional study and sought information regarding payment on a previous study.

[5]   In response to defendants' motion, plaintiff premised its due process minimum contacts analysis solely on the referenced contacts with Mississippi. The court's conclusion that these contacts will not support an exercise of jurisdiction consistent with due process obviates the need to address plaintiff's claim that all defendants are subject to jurisdiction under the "doing business" prong of the long-arm statute.

tort claims, including any attendant claim for punitive damages, on the basis that the parties' agreement provides for application of the law of New Jersey, whose economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which they are entitled only by contract." Arcand v. Brother Int'l Corp., 673 F. Supp. 2d 282, 307-08 (D.N.J. 2009). In response, plaintiff disputes that New Jersey law applies to any of its claims. Cypress argues alternatively that if New Jersey law applies at all, it applies only to the contract claims and has no bearing on the tort claims, or in the further alternative, that even if it applies to the tort claims, it has stated cognizable tort claims under New Jersey law. For the reasons which follow, the court concludes that the parties' choice-of-law provision selecting New Jersey is valid as to plaintiff's contract claims but does not encompass the tort claims. Accordingly, the motion to dismiss for failure to state a claim will be denied.[6]

While the subject agreement states, "This Agreement shall be construed according to and governed by the laws of the State of New Jersey, without regard to principles of conflicts of law," Cypress contends that under Mississippi's conflict of law rules, this provision is invalid since no relationship exists between New

---

[6]      Defendants' rebuttal brief includes a footnote in which the argument is made (for the first time) that if the court concludes New Jersey law does not apply to plaintiff's tort claims, then by virtue of Mississippi's conflicts rules, Texas law would apply and plaintiff's tort claims would be subject to dismissal under Texas' economic loss doctrine. This argument will not be considered and the court makes no determination as to which state's law should be applied to plaintiff's tort claims.

21

Jersey and the parties or the transaction.  As plaintiff notes, in the absence of contrary authority, Mississippi follows the <u>Restatement (Second) of Conflicts of Law</u>, including § 187(2)(a), which states:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice . . . .

See <u>Pic Group, Inc., v. Landcoast Insulation, Inc.</u>, 718 F. Supp. 2d 795, 799 (S.D. Miss. 2010).  Plaintiff maintains that in order to determine whether a substantial relationship exists between the parties or the transaction and the chosen state, the court must examine the contacts with the state whose law is chosen in the contract, <u>see</u> <u>Sorrells Steel Co. v. Great Sw. Corp.</u>, 906 F. 2d 158, 167 (5th Cir. 1990) (examining contacts of the state selected by the parties as related to the objectives of the contract), and they further reason that, inasmuch as defendants have identified no contacts between New Jersey and the transaction and/or parties in this case, then the parties' choice of New Jersey law should be invalidated.

Defendants do not dispute that there are no contacts between New Jersey and the parties and/or transaction in this case. However, they have presented the affidavit of CRS Vice-President John Capicchioni, who declares that "the contract purposefully contained a New Jersey choice of law provision because New Jersey

was a neutral state and New Jersey law was well developed with
respect to pharmaceutical companies and their related issues given
that many pharmaceutical companies are located in New Jersey."
Plaintiff does not challenge defendants' explanation that New
Jersey law was chosen for this reason and does not argue that
choosing New Jersey law on this basis is unreasonable.  As the
court is not persuaded that the selection of New Jersey law was
without a reasonable basis, the parties' choice-of-law provision
will not be invalidated.  See Schroeder v. Rynel, Ltd., Inc., 720
A. 2d 1164, 1166 (Me., 1998) (citing sec 187(2)(b) and concluding
that "[i]f parties choose a state's laws to govern because of that
state's well-known and established body of law, then a court will
enforce that choice of law provision").

Although the court concludes that the parties' choice of New
Jersey law is valid, the parties dispute the scope of this choice
of law.  Plaintiff takes the position that the scope should be
determined by reference to Mississippi law, which, it contends,
would narrowly construe the provision and apply it only to the
contract claims.  Plaintiff argues:

> The relevant language here is narrow–the *only* object of
> the provision is "This Agreement"–and therefore the
> scope of the choice of law provision is narrow.  Nothing
> in the text of the Agreement indicates that the parties
> intended that tort claims of any kind, and especially
> not *fraud* claims, should be governed by New Jersey Law.

For their part, defendants take the position that because the
economic loss rule is a contract theory, "it is well established

23

that the law of the state that governs the contract is the state's law whose economic loss rule applies to the case."[7]

Although Cypress contends that Mississippi law should be applied to determine the scope of the choice-of-law provision, it has not cited and the court has not located any Mississippi case examining this issue.  In <u>Finance One Public Company v. Lehman Brothers Special Financing, Inc.</u>, the Second Circuit addressed the issue, stating as follows:

> Determining which jurisdiction's law governs the scope of a valid choice-of-law clause is not a simple matter. On the one hand, once a court finds that a contractual choice-of-law clause is valid, the law selected in the clause dictates how the contract's provisions should be interpreted, and so arguably that law should also dictate how the choice-of-law clause-which is itself one of the contract's provisions-should be interpreted.  <u>See Odin Shipping Ltd. v. Drive Ocean V MV</u>, 221 F.3d 1348 (Table), 2000 WL 576436, at *1, 2001 U.S.App. LEXIS 11098, at *3 (9th Cir. May 11, 2000) (unpublished) ("The scope of [a choice-of-law] provision is a matter of contract construction and interpretation, however, which would in turn be governed by the law selected in the choice-of-law provision.").  More commonly, however, courts consider the scope of a contractual choice-of-law clause to be a threshold question like the clause's

---

[7]    The court notes that in <u>Holden Farms, Inc., v. Hog Slat, Inc.</u>, 347 F.3d 1055 (2d Cir. 2003), the court did not automatically apply the economic loss doctrine of the state whose laws the parties had chosen in their contract.  Instead, it did so only after recognizing that under the law of the forum state, "if analysis of the [tort] claims connected to the contract, involved interpretation of the contract, then the forum will apply the contractual choice-of-law provisions to the tort."  <u>Id</u>. at 1061.
In other cases cited by defendants in support of their position, the courts did apply the economic loss doctrine of the state whose contract law was chosen by the parties, but they did so without discussion or analysis.  <u>See</u>, <u>e.g.</u>, <u>Garrett Construction, Inc. v. Ashbritt, Inc.</u>, No. 1:09CV379WJG-JMR, 2010 WL 583921 (S.D. Miss February 16, 2010), and <u>Anapoell v. Am. Express Bus. Fin. Corp</u>, No. 2:07CV198TC, 2007 WL4270548 (D. Utah November 30, 2007).

validity.  Courts therefore determine a choice-of-law
clause's scope under the same law that governs the
clause's validity-the law of the forum.  See, e.g.,
Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996)
(applying New York law to interpret scope of
choice-of-law clause that selected Massachusetts law);
Maltz v. Union Carbide Chems. & Plastics Co., 992 F.
Supp. 286, 296 (S.D.N.Y. 1998) (in diversity case
transferred from Texas federal district court, applying
Texas law to determine scope of choice-of-law clause
that specified New York law); cf. Hodom v. Stearns, 32
A.D. 2d 234, 301 N.Y.S. 2d 146, 148 (App. Div. 4th Dep't
1969)(applying New York law to interpret scope of
forum-selection clause specifying that suits under
contract be brought in Oregon courts).  Different states
may approach the question of what law governs the scope
of a choice-of-law clause in different ways-in State A,
the law selected in the choice-of-law clause might
govern that clause's scope, while in State B, forum law,
which governs the clause's validity, might also govern
the scope.  Finally, parties could-though they rarely
do-specify in the choice-of-law clause itself what law
should govern questions about the clause's scope.

414 F. 3d 325, 332-33 (2d Cir. 2005).

In this instance, the court is required to make an Erie guess
as to the law Mississippi would choose to determine the scope of
the parties' choice-of-law provision.  In the event the law of New
Jersey is to be applied to determine the scope of the agreement,
it seems clear that, as defendants urge, its economic loss
doctrine would bar plaintiff's claims sounding in tort.  Saltiel
v. GSI Consultants, Inc., 788 A. 2d 268 (N.J. 2001) (applying New
Jersey's economic loss doctrine to bar contracting parties' tort
claims where plaintiff could not show that defendant owed duty
which was independent of the contract); South Broward Hosp. Dist.
v. MedQuist Inc., 516 F. Supp. 2d 370 (D.N.J. 2007)(stating under
New Jersey law, "court will look beyond how a plaintiff has
captioned or described a claim and adjudicate it based on what the

25

claim actually alleges," and finding the defendants' Rule 12(b)(6)
motion well taken where "[p]laintiffs have not alleged a duty
outside of duties outlined in the services contracts").

On the other hand, should the court conclude that the law of
Mississippi determines the scope of the provision, the court must
further make an <u>Erie</u> guess as to how Mississippi would construe
the clause.  In this regard, plaintiff urges that this court
should follow the "great majority" of cases which hold that the
choice-of-law clauses which speak of the "contract" or "agreement"
do not encompass tort claims. <u>See</u> <u>Benchmark Elecs., Inc. V. J.M.</u>
<u>Huber Corp.</u>, 343 F.3d 719, 726 (5th Cir. 2003) (applying Texas law
to determine scope of parties' choice-of-law provision and
concluding that clause providing that "the 'Agreement shall be
governed by, and construed in accordance with, the internal laws
of the State of New York'" was narrow and did not encompass tort
claims); <u>Kreger v. General Steel Corp.</u>, Civil Action 07-575, 2010
WL 2902773, * 12 (E.D. La. July 19, 2010) (concluding that choice-
of-law provision which read, "This agreement shall be governed by
and interpreted in accordance with the laws of the State of
Colorado," was narrow and did not cover tort claims).

Having considered the issue, this court concludes that
Mississippi courts, if confronted with this issue, would likely
follow the "more common" view that determining the scope of the
choice-of-law provision is a threshold issue to which its law
would apply and that it would further conclude the language at
issue reaches only the contract claims.  Accordingly, New Jersey

law will not be applied to extinguish plaintiff's tort claims, and therefore, defendants' Rule 12(b)(6) motion will be denied.

Based on the foregoing, it is ordered that the motion to dismiss on jurisdiction grounds is denied as to CRS but granted as to PRACS, Gateway and BA Research; that the Rule 12(b)(6) motion is denied; and that the motion to dismiss any claims by Hawthorne is granted.

SO ORDERED this the 28th day of July, 2011.

                                   /s/ Tom S. Lee_____
                                   UNITED STATES DISTRICT JUDGE